## W. F. THAYER ET AL v. B. S. WATHEN ET AL.

Delivered November 27, 1897.

1. **Railroad Company—Reorganization Agreement Construed—"Certificates" Mean Bonds, When.**

Where the bondholders of a railroad entered into an agreement that, at a foreclosure sale of the road, certain parties, as trustees, should buy in the property for them, and proceed to effect a reorganization, each bondholder to accept in full for his claim his pro rata part of "securities" in the new company, this meant mortgage bonds, and not certificates of stock in the new corporation.

2. **Same—Property Must Be Transferred to the Reorganized Company.**

Property of a railroad company purchased at a foreclosure sale must, where a new charter is secured and a reorganization had thereunder, be transferred by the purchasers to the new corporation, although the stockholders consist of the purchasers. Article 4550, Revised Statutes of 1895, authorizing the purchasers to form a corporation for the purpose of "acquiring, owning, maintaining, and operating the road," construed.

3. **Same—New Company May Issue Bonds for Property Bought In.**

A new corporation to which railroad property is transferred in accordance with article 4550, Revised Statutes of 1895, by purchasers of the property at foreclosure sale, may issue bonds for the purpose of acquiring the franchises and property, under article 4584e, providing that the purchasers of such property who procure it clear of

incumbrances, or "any company organized by their consent" to operate such road, may issue stock and bonds in the proportion that they deem advisable, subject to certain specified limitations.

### 4. Same—Constitutional Authority and Limitation.

A new company organized by the purchasers of railroad property at a foreclosure sale, to which company the property is transferred, has the right to issue bonds in payment for the property received by it under section 6, article 12, of the Constitution, providing that no corporation shall issue stock or bonds "except for money paid, labor done, or property actually received."

### 5. Same.

Because, upon reorganization, the parties composing both companies are the same is no bar to their dealing with each other in the transfer of the property.

APPEAL from Dallas. Tried below before Hon. W. J. J. SMITH.

*Holloway & Holloway,* for appellants.—1. The owners of property can not form a corporation and sell to the company for its stock and a mortgage on the property. A railroad can not be sold or mortgaged without statutory power. It was held by the trial court that under Revised Statutes of 1895, article 4550, the purchasers at a judicial sale may organize a new company and sell the railroad to the company for its stock and mortgage bonds. The purchasers strike a bargain with themselves. They sell to themselves as corporators of the new company. As corporators they make a mortgage to themselves as individuals. A corporation, as an entity distinct from its shareholders, is a fiction created by the law, and it can not be used to evade the law. State v. Oil Co., 49 Ohio St., 137; same case, 34 Am. St. Rep., 541, 546-7; People v. Railway, 121 N. Y., 582; same case, 18 Am. St. Rep., 843, 863, 866, 868; Foul v. Chicago Milk Co., 155 Ill., 166; same case, 27 L. R. A., 298, 303.

2. When justice requires it, equity recognizes the fact that a corporation has no existence apart from its shareholders, and that they are the real owners of the corporate property and business. 1 Mora. on Corp., secs. 227-231; 2 Mora. on Corp., sec. 818; 4 Thomp. on Corp., sec. 5314; 5 Id., sec. 6412; 3 Id., sec. 4009; Bartholomew v. Bentley, 1 Ohio St., 37, 44; Gas Co. v. West, 50 Iowa, 16, 25; Seaman v. Ins. Co., 18 Fed. Rep., 250.

3. Those who control the corporate action can not contract with the corporation. Pearson v. Railway, 62 N. H., 537; same case, 13 Am. St. Rep., 590; Chicago H. C. Co. v. Yerkes, 141 Ill., 320; same case, 33 Am. St. Rep., 315, 323; People v. Railway, 121 N. Y., 582; same case, 18 Am. St. Rep., 843, 860, 862; Jackson v. McLean, 36 Fed. Rep., 213, 216; Miner v. Ice Co., 93 Mich., 97; same case, 53 N. W. Rep., 218, 222; Meeker v. Ice Co., 17 Fed. Rep., 48, 50.

4. On a judicial sale of a railroad the title vests not in the purchasers as individuals, but in a corporation of which the purchasers and their associates are stockholders. Railway v. Morris, 67 Texas, 692; Railway v. Newell, 73 Texas, 334; Railway v. Shirley, 54 Texas, 135; Acres v. Moyne, 59 Texas, 623; same case, 35 Am. St. Rep., 399.

5. A sale by the purchasers to the new company for its stock and bonds would create a fictitious debt and could not be authorized. The

sale or mortgage of a railroad must be authorized by statute. We shall see that the statutes do not authorize the purchasers to sell to the new company for its stock and bonds, nor can the Legislature authorize such a sale. Light Co. v. Birmingham W. and E. Co., 92 Ala., 407; same case, 25 Am. St. Rep., 65, 70; 12 L. R. A., 307, 310; Railway v. Dow, 30 L. Ed., 595.

6. Article 4550 does not authorize a sale for the stock and bonds of the new company. The purchasers and their associates may form a new company "for the purpose of acquiring" the railroad. They own the road as corporators under the old charter. By taking out a new charter they surrender the old one. The old company is dissolved and the new one takes its place. The purchasers are reincorporated as owners of the railroad, and not apart from their ownership. The new company acquires the road by succession, by operation of law, and not by purchase.

7. Not even the unanimous consent of its stockholders will enable a railroad company to sell its road unless the sale is authorized by statute. 1 Mora. on Corp., sec. 414; Pierce on Railroads, 496; Railway v. State, 75 Texas, 431; Railway v. Morris, 67 Texas, 692, 700.

*Alexander, Clark & Hall,* for appellee B. S. Wathen, Trustee.—1. The property and franchises of the old company, the Dallas Rapid Transit Railway Company, had been purchased at foreclosure sale, and was conveyed, in accordance with law, to the trustees, Thayer, Studley, and Wathen, in trust for the former bondholders of said company, hereinafter styled the purchasers; that said purchasers acquired said property in consideration of turning into the court below and having canceled all of the bonds of said company, aggregating $110,000, which they owned, and the further consideration of paying into the registry of said court the cash sum of $11,000; that said purchase in the name of the trustees was made under and by virtue of a trust agreement entered into by and between said purchasers; that according to the terms of said trust agreement, said trustees were to reorganize, under the laws of Texas, said railroad as they saw fit, and to accept for said purchasers such an amount of "securities" in the "new company" to be organized by them, proportioned and to be distributed by the trustees, according to the holdings of said purchasers of bonds in the old company; that after the trustees organized the new company, the Dallas Rapid Transit and Terminal Railway Company, it was sought to have said trustees violate their duty and authority, as fixed by said trust agreement, and convey to said new company said property in consideration of its stock. It was shown that said new company could give its bonds as well as its stock for said property, and that according to the understanding and agreement between the bondholders of the old company, in making said trust agreement and in purchasing the property, it was the duty of their said trustees to obtain for them, in consideration of the conveyance to the new company of said property, the value thereof in the bonds of the new company, which said new company could lawfully issue, and agreed to

issue, to acquire said property, but refused so to do, on the ground it could not legally give bonds for the property.

2. It may be conceded that the new company tendered to the three trustees its stock in payment of said property, and it does not follow, as contended by appellants, (1) that said trustees were in duty bound, or had the authority to make said conveyance for stock; or (2) that nothing remained to be done but for said trustees to turn over said property to said new company, when it had refused to give them what they were in duty bound to require for said property, its bonds.

3. Railroad "securities" means railroad bonds, and the term "securities" being used in the trust agreement, as was understood by the parties, the trustees were only authorized to part with said property in consideration of bonds.

4. The purchasers of the property and franchises of a railroad at foreclosure sale may operate the railroad under the charter of the old company, the purchasers becoming, by law, the "corporators" thereof in lieu of the "corporators" thereof prior to the purchase. Or the purchasers may have another, a new, a distinct corporation incorporated, which new company may "acquire" the property.

5. The purchasers of the property of the old company, seeing fit to organize a new company, the statute and Constitution of the State of Texas gave the new company the right to issue bonds for the purpose of acquiring said railroad.

6. The new company being a suburban railroad, our laws creating the Railroad Commission, and regulating the issuance of bonds and stock of railroads by the Commission, chapters 13 and 14 of Revised Statutes do not apply to it.

7. The purchasers at the foreclosure sale became the individual owners of the railroad property and franchises.

Authorities: (1) As to the right of the purchasers to operate under the charter of the old company. Rev. Stats. of 1895, art. 4549. (2.) As to their right to incorporate a new company to acquire the property purchased by them. Rev. Stats. of 1895, art. 4550. (3.) As to "securities" in the trust agreement meaning bonds and not stock. 19 Am. and Eng. Encyc. of Law, 694. (4.) As to the new company having authority to issue bonds to "acquire" said property. Const., art. 12; sec. 6; Rev. Stats. of 1895, art. 4550; Railway v. Dow, 120 U. S., 299; Branch v. Jessup, 106 U. S., 468; Campbell v. Water Co., 25 N. E. Rep., 201; Coe v. Railway, 75 Am. Dec., 518, 533; Railway v. Railway, 48 N. J. Law, 530, 560; 5 Thomp. on Corp., secs. 6249, 6057; 1 Id., secs. 260, 261; 2 Id., sec. 2105.

*Coke & Coke,* for appellees Wellesley and Sanger.—1. The purchasers of the railway property at foreclosure sale could sell same to the new company created to acquire it, and such new company could issue its bonds secured by mortgage on the property and stock in payment there-

for. Rev. Stats., arts. 4350, 4543, 4549, 4550, 4584b, 4584c, 4584d, 4584e; Railway v. Dow, 19 Fed. Rep., 388; 2 Elliott on Railroads, sec. 489, and authorities; 5 Thomp. on Corp., sec. 6057.

2. The mere formation of a corporation by persons owning property which they contemplate the new corporation will acquire, does not invest the new corporation with title to the property. Carothers v. Jackson, 74 Texas, 327; McLeary v. Dawson, 87 Texas, 536.

3. The trust instrument in this case was a contract and agreement binding between the parties, and if the securities contemplated therein were bonds of the new company secured by mortgage, then the parties to said agreement have a contract right to said bonds, and can not be required to take stock in lieu of them. 1 Thomp. on Corp., 275.

RAINEY, ASSOCIATE JUSTICE.—The Dallas Rapid Transit Railway Company was a general railroad corporation, organized under chapter 1 of title 84 of the Revised Statutes of 1879. Its property and franchises were subject to a mortgage to secure $110,000 in bonds. The owners of said bonds entered into the following agreement, viz:

"Whereas, the Dallas Rapid Transit Railroad Company gave its first mortgage or trust deed to the Farmers Loan and Trust Company, dated July 21, 1890, to secure its 6 per cent bonds, which bonds are outstanding to the amount of $110,000; and,

"Whereas, default has been made in the payment of the coupon interest on said bonds which fell due on January 1, 1893, and suit has been commenced in the District Court of Dallas County by the Farmers Loan and Trust Company for the foreclosure of said mortgage or trust deed, and sale of the property covered thereby, said trustee intervening in the suit of the North Texas National Bank v. Dallas Rapid Transit Railroad Company, and it has become necessary for the holders of said bonds to enter into some agreement and to co-operate together for their mutual protection.

"Now, therefore, this agreement made by and between each of the bondholders of said bonds as shall become parties thereto, or to any other instrument of the same tenor, witnesseth:

"That the parties hereto, and to any other instrument of the same tenor, in consideration of the premises and of one dollar to each of them interchangeably paid, mutually covenant and agree with each other as follows:

"(1) To consent to the earliest practicable sale of the property of the Dallas Rapid Transit Railway Company; to appoint three trustees to oversee and hasten the foreclosure and purchase of said property, who shall serve without compensation. Two of the trustees shall be resident in New England, and one in Dallas, Texas, and the same shall be William F. Thayer, Edward A. Studley, and B. S. Wathen. Said trustees shall hold their office until they shall have completed the purchase of said property, in trust, nevertheless, for said bondholders. On the com-

pletion of purchase, they shall direct the reorganization of the company, and distribute the securities of the reorganized concern pro rata among the bondholders as hereinafter provided for.

"(2) To become personally responsible for the expenses of the purchase of said property under the sale, which expenses shall be limited to the legal charges.

"(3) To forthwith, on signing this agreement, deliver into the hands of said trustees, or to forward to such national bank as they shall direct, the bonds and coupons held by each signer, and all the interest of said signer, in trust, however, for carrying out this agreement.

"(4) To pay at once into the hands of said trustees an assessment of 10 per cent upon the face value of the bonds, the same to be used only to meet the expenses of the foreclosure suit, and such other charges as the court may recognize.

"(5) To consent to the canceling of the individual bondholders' interest in this agreement, by the majority of the other bondholders, provided said bondholder does not deposit his bonds or assessment within the time to be prescribed by the trustee (not less than thirty days) after the signing of this agreement, with the trustees appointed under the clauses of this contract.

"(6) To grant to the majority of the bondholders the right of reinstating any bondholder in his privileges, if they shall see fit, after his name shall have been canceled by consent.

"(7) To authorize the trustees to provide a scheme of reorganization of the Dallas Rapid Transit Railroad Company under the laws of Texas, and to accept in full for all claims under the bonds referred to in this agreement such an amount of securities in said new company as shall be proportioned to the number of bonds held by them.

"(8) To grant unto said trustees the powers necessary to the carrying out of the provisions of this agreement under the conditions of their trust.

"(9) And it is provided further by and between the aforesaid contracting parties that if a bondholder shall in good faith deposit his bonds, but shall not be able to meet the necessary assessment provided for in said agreement, then if he shall, within fifteen days previous to the sale of said property, pay his assessment to said trustees, he shall be reinstated, and be entitled to all the privileges accorded to the parties under this agreement."

There was a decree foreclosing the mortgage referred to in said agreement; and on December 4, 1894, under said decree, the charter rights, franchises, and all the property of said company were sold to W. F. Thayer, E. S. Studley, and B. S. Wathen, as trustees, and the same duly conveyed to them by deed of date December 15, 1894.

That portion of the decree of foreclosure providing for the payment of the purchase money is as follows: "It is further ordered that the purchaser at such sale, when the property is struck down to him, shall at once pay the receiver the sum of ten thousand dollars in cash, and upon

the failure upon the part of such purchaser to comply with this direction and pay the said sum of ten thousand dollars in cash, said property shall be at once resold, and the balance of the purchase price may be paid, either in money or in the bonds and overdue coupons secured by said mortgage, each of said bonds and coupons being received for such sum as the holder thereof would be entitled to receive under the distribution herein ordered."

All the bondholders signed the trust agreement, deposited their bonds, and paid in the 10 per cent assessment. The trustees bought for 35,000, of which $10,000 was paid in cash and the balance in bonds amounting to $110,000. The $10,000 was paid out of the 10 per cent assessment paid under the trust agreement. The remaining $1000 of the assessment was used in paying the expenses of the foreclosure.

On May 14, 1895, there was a meeting of the "purchasers of the Dallas Rapid Transit Railway," attended by the holders of eighty-three of the 110 bonds. It was resolved that a new charter be applied for, with a capital stock of $100,000, and the new company called "The Dallas Rapid Transit and Terminal Railway Company;" that the new company issue $150,000 of bonds, of which $110,000 be distributed to said purchasers, in accord with said trust agreement, and $40,000 to be retained in the treasury.

On June 11, 1895, the trustees and their associates caused to be incorporated under the laws of Texas the Dallas Rapid Transit and Terminal Railway Company. The charter recites that the trustees have purchased at the foreclosure sale all the property, corporate privileges, franchises, and immunities of the old company, and that the trustees and their associates desire to form a corporation for the purpose of acquiring, maintaining, and operating the road so purchased.

On July 1, 1895, the officers of the new company were elected and the old bondholders met as stockholders of the new company. It was resolved that the new company buy the property of the old company from the trustees for $150,000 in first mortgage bonds, and $11,000 in the stock of the new company.

On July 10, 1895, Thayer and Studley executed and acknowledged a deed, whereby the trustees purported to convey the property and franchises to the new company for $150,000 in first mortgage bonds and $11,000 in stock. The deed was tendered to B. S. Wathen for execution. He took the deed and kept it, but did not sign it until the day after the filing of this suit. He then signed and acknowledged the deed and tendered it at the trial. Wathen gave as a reason for not signing the deed that there were suits filed against the trustees arising out of the operation of the road, and that he was advised by his attorneys that if the parties prosecuting the suits won, he would be held personally liable.

On February 26, 1896, there was a meeting of the stockholders of the new company, at which there were represented the holders of 104 of the original 110 bonds. It was resolved to issue $150,000 in bonds,

$110,000 to be used to pay for the property and the balance to improve and equip the same. All the defendants voted against the resolution.

On April 22, 1896, there was a meeting of the board of directors of said company, the proceedings being as follows:

"President Thayer stated that the object of the meeting was to consider whether or not it was advisable to call another stockholders' meeting for the purpose of considering an issue of $150,000 in bonds to be secured by deed of trust upon all the company's property; it appearing that some of the stockholders were dissatisfied with the action under the call for a meeting on October 24, 1895, owing to some alleged irregularities in proxies presented at the meeting and adjournment thereof. After a formal discussion of the matters pertaining to those proxies, etc., A. F. Hardie offered the following resolution: 'It appearing that the meeting of the stockholders of the Dallas Rapid Transit and Terminal Railway Company, held on October 24, 1895, and adjournments thereof, was, by some of the stockholders, considered illegal on account of alleged irregularities of some of the proxies presented at that meeting; resolved, that it is deemed best for the interests of all concerned, that another meeting of the stockholders be called as soon as practicable.' Upon motion the resolution was adopted.

"Mr. Hardie then offered the following resolution, which was seconded by J. S. Hetherington, and adopted: 'A meeting of the stockholders of said corporation is hereby called to meet at the office of the company, in the city of Dallas, Texas; at 10 o'clock a. m. on Wednesday, June 24, 1896, to determine and vote upon the proposition to issue $150,000 in bonds, said bonds to be of the denomination of $1000 each, with interest at 5 per cent per annum, payable semi-annually, and to secure said bonds by a mortgage upon all the property, franchises, and effects of said railway company, $110,000 of said bonds to be used in paying for said property and the balance to be used in improving and equipping the same, and for other purposes connected with the operation of the railroad.' "

The meeting so called for June 24, 1896, was not held for the want of a quorum.

On July 16, 1896, there was another meeting of the stockholders of said company, when a committee composed of T. T. Holloway and B. S. Wathen, theretofore appointed, reported that it would be illegal for the company to issue bonds to said purchasers in consideration of said railroad property; that the only practicable and legal way to complete the organization of the new company was to issue the stock of the new concern, $100,000 (valuing the property at that amount) to be distributed by the trustees among the purchasers in proportion to their holdings of bonds. Alexander, Clark & Hall concurred in this report, which was unanimously adopted. Thereupon said meeting passed a resolution rescinding said action of the stockholders' meeting of July 1, 1895, namely, that the new company buy from the trustees said property and give therefor $150,000 of its bonds and $11,000 of its stock, and adopted the following resolution:

"Resolved, That the capital stock of this company be issued in the amount of $100,000, to be divided among the several members of this corporation, in proportion to their interest, that is, each person shall have that proportion of the entire stock that the number of bonds of the Dallas Rapid Transit Railway Company, formerly held by them, or by those whose interest he has, bears to the entire number of the bonds, 110 in all."

It was shown that Mr. Alexander, who signed said report for Alexander, Clark & Hall, did so without making any charge, and without examination, understanding (that is, being told) it was proposed to issue stock and bonds of the new company each to the amount of the value of the property to be conveyed.

It was shown that at the various meetings of the stockholders of the new company the appellants and appellees voted in proportion to their respective holdings of bonds in the old company. Certificates of stock of the new company to the amount of its capital stock of $100,000 were duly signed and sealed August 1, 1896, in the name of the parties plaintiff and defendant, in the proportion as shown in plaintiffs' petition, the said parties being the holders of the original 110 bonds, or their successors in interest. No cash was ever paid upon the stock of the new company; no property has ever been actually conveyed to the new company. The trustee, B. S. Wathen, refused to accept or distribute the said certificates of stock, and the same still remain in the office of the company. Said certificates of stock have never been delivered and accepted by the defendants, but have been accepted by plaintiffs, but not delivered.

It was shown that on July 27, 1896, trustees Thayer and Studley executed a deed, conveying the property and franchises aforesaid to the new company, the consideration being $100,000 in stock. That on August 1, 1896, this deed was tendered to B. S. Wathen, and he refused to sign it. At that time all suits against the trustees, or the new company, had been settled and dismissed.

The property and franchises are worth $100,000. The earnings of the road are about equal to the operating expenses. Since the foreclosure sale the property has been in the possession of the trustees, who have been operating the road through a general manager.

The executors, administrators, and trustees named in plaintiffs' petition entered into the trust agreement, surrendered their bonds, and paid in the 10 per cent assessment. The bonds were payable to the bearer, and were in the usual form of first mortgage railroad bonds. At the various meetings of the stockholders of the new company, said executors, administrators, and trustees voted in proportion to their holdings of the old bonds.

*Opinion.*—This suit was brought by appellants seeking a construction of the trust agreement set forth in the conclusions of fact, and to require B. S. Wathen, one of the trustees, to accept stock of the new company

and transfer the franchises and property of the Dallas Rapid Transit Railway Company to the new corporation organized by virtue of said trust agreement. The contention being on the part of appellants, that the term "securities," as used in the said agreement, means certificates of stock, "which are the only securities of the new company which could be distributed among the parties to said trust agreement."

The term "securities" in its broadest sense, embraces bonds, certificates of stock, and other evidences of debt or of property. In 19 American and English Encyclopedia of Law, p. 694, it is stated that the term railroad securities ordinarily means bonds. The Encyclopedic Dictionary defines a security to be "an evidence of debt or property, as a bond, a certificate of stock, or the like."

What the term "securities" as used in the trust agreement embraces, must be determined from the entire contract, in the light of the facts surrounding the transaction.

When the agreement was entered into the parties held mortgage bonds, and while not definitely expressed in the agreement, we think it fair to presume that the parties intended that the securities to be distributed should be of the same character as those they were surrendering. It can not be seriously contended that certificates of stock are the same as mortgage bonds, for such certificates are but an evidence of ownership of an interest in corporate rights, while mortgage bonds are security for the payment of money.

Cook on Stock and Stockholders, etc., defines stock "as a proportional part of certain rights in the management and profits of the corporation during its existence, and in the assets upon its dissolution." Vol. 1, sec. 12.

Shares of stock are not money; nor are they security for money; nor a credit. Id., and notes 4, 5, and 6. While upon the other hand, a bond of a corporation is an instrument executed under the seal of the corporation, acknowledging the loan and agreeing to pay the same upon the terms set forth therein." Id., sec. 15.

But aside from this, the actions of the parties after the purchase show that the intention was that the new corporation should issue bonds to be distributed among the original bondholders according to their respective holdings. The foreclosure sale was made December 4, 1894. On May 14, 1895, there was a meeting of the old bondholders, more than a two-thirds interest being represented (which meeting seems to have been the first so held after the sale), at which meeting it was resolved that a new charter be applied for, and that there be issued $150,000 of bonds, $110,000 of which to be distributed to the original holders and the balance to remain in the treasury.

On July 1, 1895, after a new charter had been procured, at the first meeting of the stockholders of the new company a similar resolution to issue bonds was passed. Similar action was had at a special meeting of the stockholders on February 26, 1896. On April 22, 1896, at a meeting of the directors of the new company, there being some question as to the

legality of the former meeting authorizing the issue of bonds, another meeting of stockholders was called for June 24, 1896, to vote upon the proposition to issue bonds. No meeting was held June 24, 1896, for the want of a quorum. Up to this time the issuance of certificates of stock for distribution had not been mentioned; nor does it appear that such was ever contemplated until July 16, 1896, when, at a meeting of the stockholders, it was resolved to issue certificates of stock; the meeting having been informed through a committee that the issuance of bonds would be illegal. Thus it will be seen that for about eighteen months the parties to the trust agreement contemplated only the issuance of bonds, from which the conclusion follows that the parties, at the time of making the agreement, intended the securities to be distributed should be mortgage bonds.

This brings us to the consideration of the power of the new corporation to issue bonds for distribution among the original bondholders as contemplated by the trust agreement. When the road was sold under the foreclosure decree and bid in by the trustees, they held the title to same in trust for the original bondholders, free from all prior incumbrances, and they were authorized to operate the road under the original charter (Rev. Stats., art. 4549); or they were entitled to form a corporation for the purpose of "acquiring, owning, maintaining, and operating the road" so purchased. Rev. Stats., art. 4550. They saw proper to adopt the latter mode, and a new charter was obtained by the original bondholders; and it is insisted by appellants that when said charter was obtained and an organization had thereunder, the purchasers of the road and the stockholders of the new company being the same, the franchises and property of the old company vested in the new.

In support of this contention the cases of Railway v. Morris, 67 Texas, 692; Railway v. Murrell, 73 Texas, 334; Railway v. Shirley, 54 Texas, 125; Acres v. Moyne, 59 Texas, 623, are relied on. The effect of these decisions, as we understand them, is that when a railway and franchises are sold the corporation is not dissolved thereby, but "the corporation continues and the purchasers become, in effect, new stockholders." This is in strict accord with article 4549, Revised Statutes, which was the only provision of our statutes relating to this subject then in existence. Since then article 4550, Revised Statutes (Acts 1889), has been passed, which authorizes the purchasers and their associates to form a corporation for the purpose of "acquiring, owning, maintaining, and operating" the road so purchased. There must have been some reason existing in the minds of the legislators for adding this new provision. If the effect of a new charter left the purchasers in exactly the same position as they were under the old, there would be no necessity of the expense and trouble of procuring a new one. We are of the opinion that the cases relied on do not apply to article 4550, Revised Statutes. When a new charter is secured and a reorganization had thereunder, though the stockholders should consist of the purchasers, it is a different and distinct corporation from the old corporation, and for the new company to become the owners

of the property and franchises of the old, there must be a transfer thereof made to the new. Caruthers v. Alexander, 74 Texas, 309; McLeary v. Dawson, 87 Texas, 524. When a corporation is formed by the purchasers, article 4550, Revised Statutes, does not provide that the new company shall, by reason of its charter, become vested with the rights of the purchasers in such franchises and property; but it does provide, however, that the new company may acquire the road so purchased, and be entitled to all the powers and privileges conferred by the laws of this State upon chartered railroads. This provision (article 4550, Revised Statutes), by the use of the term "acquiring," evidently did not consider that the new company would be the owner of the franchises and property of the old, for if so, there is no use of the word "acquiring," as there would be nothing to acquire.

The new company must acquire the property from the purchasers before it is vested with the title thereto. How can this be done? The general answer is, by any means that may be agreed upon between the purchasers and the new company not in violation of law. Would the issuance of bonds by the new company for the purpose of acquiring the franchises and property from the purchasers be unlawful? We think not. The rule regulating the issuance of bonds by railroad corporations, such as are under discussion, is found in chapter 14, Revised Statutes. Article 4584e provides: "The purchasers of said property who procure it clear of incumbrance, or any company organized by their consent to operate said railroad under and in pursuance of the laws of this State, may issue stocks and bonds in the proportion that they may deem advisable, subject to the rules, restrictions, and limitations prescribed in articles 4584b, 4584c, and 4584d.

The limitation in article 4584b is, that no issuance of bonds or other evidence of debt shall be made, and secured by lien or mortgage, "over and above the reasonable value of said railroad property;" except when permitted by the Railroad Commission, which may upon certain contingencies, "permit said bonds, together with the stock in the aggregate, to be executed to an amount not more than 50 per cent over the value of said property."

Article 4584d, Revised Statutes, provides that the purchaser at judicial or other sale of any railroad shall take the same free from indebtedness and the claims of stockholders; and that "it shall not be lawful for said purchasers or for any railroad company organized hereafter to operate said railroad, to issue any stock in lieu of the old stock, or to allow any compensation therefor in any manner whatever, nor shall all or any part of the debt to satisfy which such sale is made be continued or held as a claim or lien on said property."

The limitation, it will be noted, is upon the amount, which shall not exceed the value of the property, except in certain contingencies, and the further limitation as to the continuing old indebtedness as specified in article 4584d.

The Constitution, section 6, article 12, says: "No corporation shall

issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." This provision allows bonds to be issued for property received; and if the new company receives the property, it would have the right to issue bonds in payment therefor.

Under the statute the new corporation had the right to acquire property. The trustees held the road purchased in trust for the bondholders, and to secure the title to said property the new company had a right to issue bonds for the purpose of acquiring the same. Railway v. Dow, 19 Fed. Rep., 388. The trustees are bound only by the terms of the trust agreement, and the powers of the court can not be invoked to require them to act contrary to its provisions.

Because the parties composing both companies are the same is no bar to their dealing with each other. All that the law requires in such cases is that the transaction should be free from fraud and executed in good faith.

The plaintiffs were not entitled to the relief sought, and there was no error in the court so holding.

We deem it unnecessary to discuss the action of the court in sustaining exceptions to plaintiffs' petition and dismissing the foreign executors who were parties plaintiff, on the ground that they had no right to sue in such capacity, for if entitled to sue, they were not entitled to recover in this action.

The judgment is affirmed.

*Affirmed.*

Writ of error denied.